TO: Clerk's Office
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
UNITED STATES OF AMERICA

-v.-

SHERRY XUE LI,
and LIANBO WANG, Defendants
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

22-MJ-756
_____
Docket Number

SUBMITTED BY: Plaintiff___ Defendant___ DOJ ✔
Name: AUSA JOSH HAFETZ
Firm Name: USAO-EDNY
Address: _____

Phone Number: 929-888-4077
E-Mail Address: joshua.hafetz@usdoh.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES___ NO ✔
**If yes, state description of document to be entered on docket sheet:**

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered: _____
Judge/Magistrate Judge: _____
Date Entered: _____

**B) If a new application**, the statute, regulation, or other legal basis that
authorizes filing under seal

_____

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE,**
**AND MAY NOT BE UNSEALED UNLESS ORDERED BY**
**THE COURT.**

DATED: Brooklyn _____, NEW YORK

Ramon E. Reyes, Jr. Digitally signed by Ramon E. Reyes, Jr.
Date: 2022.07.14 15:28:18 -04'00'
_____
**U.S. MAGISTRATE JUDGE**

RECEIVED IN CLERK'S OFFICE _____
                                            DATE

**MANDATORY CERTIFICATION OF SERVICE:**
**A.)** ___ A copy of this application either has been or will be promptly served upon all parties to this action. **B.)** ___ Service is excused by 31 U.S.C. 3730(b), or by
the following other statute or regulation: ___ ; or **C.)** ___ This is a criminal document submitted, and flight public safety, or security are significant concerns.
(Check one)

July 14, 2022
_____
DATE

_____
SIGNATURE

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| United States of America<br>v.<br><br>SHERRY XUE LI,<br><br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) |

Case No.  22-MJ-756

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*    SHERRY XUE LI                                                                ,

who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment          ❏ Superseding Indictment      ❏ Information      ❏ Superseding Information      ☑ Complaint

❏ Probation Violation Petition        ❏ Supervised Release Violation Petition        ❏ Violation Notice      ❏ Order of the Court

This offense is briefly described as follows:

Conspiracy to commit wire fraud, in violation of 18 U.S.C. 1349; Money Laundering Conspiracy, in violation of 18 U.S.C.
1956(h); and Conspiracy to defraud the United States, in violation of 18 U.S.C. 371

Date:       07/14/2022

Ramon E. Reyes, Jr. Digitally signed by Ramon E. Reyes, Jr.
Date: 2022.07.14 15:29:36 -04'00'

*Issuing officer's signature*

City and state:    Brooklyn, NY

Hon. Ramon E. Reyes, Jr.

*Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____<br>at *(city and state)* _____ . |
| Date: _____                  _____<br>                                                              *Arresting officer's signature*<br><br>                                                              _____<br>                                                              *Printed name and title* |

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

_____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____        Weight: _____

Sex: _____        Race: _____

Hair: _____        Eyes: _____

Scars, tattoos, other distinguishing marks: _____

_____

History of violence, weapons, drug use: _____

_____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

_____

FBI number: _____

Complete description of auto: _____

_____

Investigative agency and address: _____

_____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

_____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

_____

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No.   22-MJ-756 |
| LIANBO WANG, | ) | |
| also known as "Mike Wang," | ) | |
| | ) | |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*   LIANBO WANG, also known as "Mike Wang" ,

who is accused of an offense or violation based on the following document filed with the court:

❑ Indictment ❑ Superseding Indictment ❑ Information ❑ Superseding Information ☑ Complaint
❑ Probation Violation Petition ❑ Supervised Release Violation Petition ❑ Violation Notice ❑ Order of the Court

This offense is briefly described as follows:

Conspiracy to commit wire fraud, in violation of 18 U.S.C. 1349; Money Laundering Conspiracy, in violation of 18 U.S.C. 1956(h); and Conspiracy to defraud the United States, in violation of 18 U.S.C.  371

Date:      07/14/2022

Ramon E. Reyes, Jr. Digitally signed by Ramon E. Reyes, Jr.
Date: 2022.07.14 15:30:09 -04'00'

*Issuing officer's signature*

City and state:    Brooklyn, NY

Hon. Ramon E. Reyes, Jr.

*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |

Date: _____

_____
*Arresting officer's signature*

_____
*Printed name and title*

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

_____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____     Weight: _____

Sex: _____     Race: _____

Hair: _____     Eyes: _____

Scars, tattoos, other distinguishing marks: _____

_____

History of violence, weapons, drug use: _____

_____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

_____

FBI number: _____

Complete description of auto: _____

_____

Investigative agency and address: _____

_____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

_____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

_____

DMP:RTP/ICR/JGH
F. #2017R00137

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

SHERRY XUE LI and
LIANBO WANG,
    also known as "Mike Wang,"

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
ARREST WARRANTS

Docket No. 22-MJ-756
(T., 18 U.S.C., §§ 371, 1349 and 1956(h))

EASTERN DISTRICT OF NEW YORK, SS:

        Ronald Chang, being duly sworn, deposes and states that he is a Special Agent

with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

<u>WIRE FRAUD CONSPIRACY</u>

        In or about and between May 2013 and May 2022, both dates being approximate

and inclusive, within the Eastern District of New York and elsewhere, the defendants SHERRY

XUE LI and LIANBO WANG, also known as "Mike Wang," together with others, did knowingly

and intentionally conspire to devise a scheme and artifice to defraud investors, and to obtain money

and property from investors by means of one or more materially false and fraudulent pretenses,

representations and promises, and for the purpose of executing such scheme and artifice, to

transmit and cause to be transmitted, by means of wire communication in interstate and foreign

commerce, one or more writings, signs, signals, pictures and sounds, to wit: wire transfers,

contrary to Title 18, United States Code, Section 1343.

        (Title 18, United States Code, Section 1349)

## MONEY LAUNDERING CONSPIRACY

In or about and between May 2013 and July 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SHERRY XUE LI and LIANBO WANG, also known as "Mike Wang," together with others, did knowingly and intentionally conspire to conduct one or more financial transactions in and affecting interstate commerce, which involved the proceeds of a specified unlawful activity, to wit; wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h))

## CONSPIRACY TO DEFRAUD THE UNITED STATES

In or about and between January 2016 and March 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SHERRY XUE LI and LIANBO WANG, also known as "Mike Wang," together with others, did knowingly and intentionally conspire to defraud the United States by impairing, obstructing, and defeating the lawful functions of a department or agency of the United States, to wit: the function of the Federal Election Commission to administer federal law concerning source and amount restrictions in federal and State elections, including the prohibitions applicable to foreign nationals and straw donors.

(Title 18, United States Code, Section 371)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been for more than seven years.   I am familiar with the facts and circumstances set forth below from my participation in the investigation, my review of the investigative file, and from reports of other law enforcement officers involved in the investigation.   Where the contents of documents and written communications are summarized herein, they are done so in sum and substance and in pertinent part unless otherwise indicated.   This Affidavit also contains translations and summaries of Mandarin Chinese communications that have been translated into English by FBI linguists.   The translations reflected in the Affidavit are based on draft translations and are subject to revision.   Where the Affidavit references individuals and entities by pseudonym, the identity of these individuals and entities is known to the Affiant.

I.     The Defendants, Relevant Entities and Regulatory Background

A.     Sherry Xue Li

2.     The defendant SHERRY XUE LI ("LI") is a naturalized United States citizen, who at all times relevant to the complaint has resided at her residence located in Oyster Bay, New York (the "Oyster Bay Residence").   As discussed below, between May 2013 and the present (the "Relevant Period"), from her headquarters at the Oyster Bay Residence, LI has orchestrated a scheme to defraud victim-investors by inducing them to invest capital in a fictitious project to develop, construct and operate a private international education center in Sullivan

---

[1]     Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

County, New York named the "Thompson Education Center" or "TEC" (the "TEC Project"), of which LI is the President.

B.    Lianbo Wang

3.    Throughout the Relevant Period, the defendant LIANBO WANG, also known as "Mike Wang" ("WANG"), was the marketing director and general manager of Thompson Education Center.    WANG currently resides with LI at the Oyster Bay Residence. WANG is a naturalized United States citizen.

C.    The TEC Entities

4.    LI, WANG and their co-conspirators have fraudulently induced investors to contribute capital to the TEC Project and have siphoned off the proceeds of the scheme for their personal benefit through the use of a network of dozens of business entities.    LI and her co-conspirators have formed and control numerous corporations, partnerships and limited liability companies whose names often include a reference to the TEC Project, including for example Thompson Education Group; Thompson B Management, LLC; Thompson B-1 EB-5, LP; and Thompson B-1 Education Center, LLC (collectively, the "TEC Entities").    After creating the TEC Entities, LI frequently opened bank accounts in the names of the TEC Entities that LI, WANG and their co-conspirators controlled.    Beginning in or about May 2013, LI and WANG used the TEC Entities and their bank accounts as vehicles to solicit investments in the TEC Project from victim investors, including foreign nationals of the People's Republic of China ("PRC") desiring to obtain lawful permanent residence in the United States.    LI and WANG have also used the TEC Entities to divert victim-investor funds to pay for personal expenses and to withdraw proceeds of their fraud for personal use.

D.    The EB-5 Program

5.    The EB-5 Visa Program (the "EB-5 Program") was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign investors.   Under the program, which is administered by the United States Citizenship and Immigration Services ("USCIS"), foreign nationals are eligible to petition USCIS to become lawful permanent residents of the United States when they show they have (a) invested $500,000 in a high unemployment or rural area (or $1 million in any area), (b) in a new commercial enterprise, (c) that carries a risk of loss and (d) creates at least 10 full-time jobs for U.S. workers.

6.    Projects seeking to solicit EB-5 Program investors often promote not only the potential financial return, but also the path which the EB-5 Program provides for such investors to obtain the prospective immigration benefit of lawful permanent resident status.   Individuals or entities seeking to solicit EB-5 Program investors are prohibited from guaranteeing, whether explicitly or implicitly, that investors will be granted lawful permanent resident status.   Further, investors' capital must remain "at risk" throughout the duration of the project for the investors to be eligible for any immigration benefit.   To the extent that the investor is promised and/or guaranteed a return on their investment, it would not fall within the scope of the EB-5 Program and the investor would not be eligible for any immigration benefit.

7.    After making the $500,000 investment, the foreign investor may petition USCIS for a conditional lawful permanent resident status (often referred to as a "temporary green card"), which is valid for two years.   As part of his or her initial petition for a temporary green card, the investor submits an EB-5 economic report that outlines how many jobs the investment is projected to create and whether those jobs are direct or indirect.   The primary mechanism for an EB-5 investor to apply to USCIS for a temporary green card through the EB-5 investment process

is the I-526 Immigrant Petition by Alien Entrepreneur form, through which the investor demonstrates that he/she is in the process of investing or has already invested the requisite amount of capital in a suitable EB-5 project.

8.      At the end of the two-year conditional period, the EB-5 Program investor may request that USCIS issue a permanent green card.   In determining whether to grant the request for a permanent green card, USCIS considers, among other things, whether the actual project costs and/or revenues resulting from the EB-5 investment were sufficient to create the required jobs.

      E.      The Federal Election Campaign Act

9.      The Federal Election Campaign Act ("FECA") is administered by the Federal Election Commission ("FEC").   Candidates and political committees are required to make periodic reports to the FEC identifying each person who contributes money or any thing of value by name, occupation, employer and mailing address.   See 11 C.F.R. §§ 100.12, 104.3. Among other things, FECA makes it unlawful for "a foreign national, directly or indirectly, to make a contribution or donation of money or other thing of value, . . . in connection with a Federal, State, or local election," or to make "a contribution or donation to a committee of a political party," and further makes it unlawful for any person to solicit, accept, or receive such a contribution or donation from a foreign national.   52 U.S.C. § 30121(a); see also 11 C.F.R. § 110.20.   FECA also makes it unlawful for a person to "make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution," what is commonly referred to as a "straw" donation, and further provides that "no person shall knowingly accept a contribution made by one person in the name of another person."   52 U.S.C. § 30122; see also 11 C.F.R. § 110.4.   FEC regulations provide that "[a]ll contributions by a person . . . to a candidate, including

contributions which are in any way earmarked or otherwise directed to the candidate through an intermediary or conduit, are contributions from the person to the candidate." 11 C.F.R. § 110.6(a). FEC regulations prohibit candidates and political committees from knowingly accepting any contributions in violation of these prohibitions, see 11 C.F.R. § 110.9, and require candidates and committees to use their best efforts to obtain, maintain and submit required contributor-identifying information to the FEC by requesting identifying information from contributors when soliciting contributions, see 11 C.F.R. § 104.7. When contributors make straw donations or otherwise withhold information from candidates and political committees about the identity of the contributors, that affects the ability of candidates and committees to comply with the relevant FEC regulations.

## II.   The Defendants' Fraud Scheme

10.   Throughout the Relevant Period, LI and WANG, together with others, conspired to effectuate, and effectuated, a scheme to defraud investors out of millions of dollars.

11.   Beginning in or about 2011, LI and WANG, together with others, publicly announced their plans to construct and operate a Chinese cultural theme park that they named China City of America ("CCOA") on an undeveloped tract of land in Sullivan County, New York. The proposed project site, which included wetlands, spanned land located in the towns of Mamakating, Thompson and Fallsburg, New York. In numerous marketing materials designed to induce potential investors to invest in the project, LI touted CCOA as a "Chinese Disneyland" that would include an amusement park, mansions, business center, medical center, college and residential homes. LI and her co-conspirators told potential investors that CCOA would have approximately 1.5 million annual visitors and create approximately 3,000 jobs.

12.     On or about May 23, 2013, LI gave a presentation touting the proposed construction of CCOA at a public meeting held in Mamakating, New York.   At the meeting, Mamakating residents expressed skepticism about LI's CCOA proposal, including concerns that LI's proposed construction would negatively impact the area's environment and would result in Mamakating's population density changing from a low-density area to a high-density area.

13.     Soon thereafter, in the second half of 2013, a local official from Thompson, New York, where LI had given a nearly identical presentation to the one she gave in Mamakating, informed LI that CCOA could not be built on the site proposed by LI because the land in Thompson was not zoned for the projected use.   Almost immediately thereafter, and after viewing a list of the permissible land uses on the proposed project site – which included educational centers – LI abandoned the proposed CCOA project and instead proposed constructing and operating a for-profit university that she would eventually name Thompson Education Center.

14.     In furtherance of the fraud scheme, LI, WANG and their co-conspirators described the TEC Project to potential investors as a "multi-phase project."   The first phase of the TEC Project would be the construction of two college classroom buildings, two college student activity centers, a sports center, a community center and six student housing buildings, including 132 units of townhouse-style housing, 200 two-bedroom apartments and 50 three-bedroom apartments.   LI, WANG and their co-conspirators told potential investors that the total cost of construction of the first phase of the TEC Project was estimated to be $150 million.   LI and WANG also told investors that TEC intended to raise $60 million from 120 EB-5 investors and the remaining $90 million from other sources, including debt and equity investors, to fund the construction of the project.

15.     To effect their scheme, and as further detailed below, LI, WANG and other members of the conspiracy made and caused to be made, among others, one or more of the following materially false and misleading representations to investors and potential investors, to USCIS and to others: (1) that EB-5 investors in the TEC Project were guaranteed to receive a green card in return for their investment; (2) that the TEC Project had received the required construction permits and approvals from local governments to build the project and that the TEC Project was already under construction; (3) that TEC was being audited by a major accounting firm and had agreed to partner with a major investment bank to conduct an initial public offering ("IPO") and that TEC would list its stock on the New York Stock Exchange; (4) that TEC had secured partnership agreements with prominent universities to enroll, educate, and issue diplomas to students; and (5) that the conspirators' ties to high-ranking elected and government officials assured the TEC Project of political support to attain regulatory approvals.

16.     In truth and in fact, LI, WANG and other members of the conspiracy siphoned off the money they fraudulently obtained from investors by transferring the funds through bank accounts held in the names of various companies that LI had created.   Once the funds were in those accounts, LI and WANG used the funds to pay for numerous personal expenses including clothing and accessories, jewelry, housing, vacation travel, upscale dining, and political contributions to prominent politicians.   The portion of the invested capital LI and WANG actually spent on the TEC Project was used merely to create and perpetuate the fiction that the TEC Project was a viable development project that was actually under construction.   For example, LI and WANG hired contractors, engineers and other professionals to create architectural drawings and plans and perform minor work on or around the development site, which LI and WANG showed to potential investors to mislead them into believing the TEC Project had a realistic probability of

completion and of delivering the returns on investment that the conspirators promised their investors.   While LI and WANG used investor funds to initially pay these professionals for this work, LI and WANG eventually stopped paying them, despite LI and WANG continuing to receive investor funds and spending large sums of the funds on personal expenses.

17.     As of July 2022, LI, WANG and their co-conspirators have raised at least approximately $27 million from more than 150 investors in the TEC Project.   This includes $16.5 million raised from EB-5 investors who were promised a green card in return for their investment, and approximately $11 million from stock investors who were promised that an IPO would take place.

18.     To date, no EB-5 investor in the TEC Project has received a temporary or permanent green card; to the contrary, beginning in or about March 2017, USCIS began issuing notices of intent to deny ("NOIDs") EB-5 investors' petitions for temporary green cards because USCIS did not find TEC's business plan credible.   Among other reasons cited by USCIS in denying the temporary green card petitions, USCIS noted that the TEC Project lacked the required permitting and zoning approvals for construction of the project.[2]  To date, the petitions for a temporary green card by 26 EB-5 investors in the TEC Project have received NOIDs, and 16 of these 26 investors have received final denials of their petitions from USCIS after exhausting the applicable appeal process.

---

[2]     A Notice Of Intent to Deny (NOID) is a notice that USCIS sends to EB-5 applicants that notifies the applicant that USCIS intends to deny their petition, based on a determination of ineligibility, after a review of the petition and supporting evidence, submitted by the applicant/petitioner.   After receiving a NOID from USCIS, the applicant has 33 days to file a response to the NOID in which the applicant may provide additional information necessary to refute USCIS's basis for intended denial.   If a response to a NOID is not timely filed with USCIS, USCIS will then deny the applicant's petition.   Following such denial, an applicant may appeal the denial.

19.     As of March 2022, LI, WANG, and their co-conspirators have misappropriated and laundered at least $2 million in TEC Project investor funds.   During this same period, LI, WANG and their co-conspirators spent at least an additional $2.5 million dollars in investor funds on various personal expenses with no clear business purpose, none of which was reported as income to the Internal Revenue Service by LI or WANG.

A.     False And Misleading Statements To Investors

20.     In order to induce investors, including foreign nationals, to invest in the TEC Project, including via the EB-5 program, LI, WANG and their co-conspirators made numerous false and misleading statements to investors and potential investors in the TEC Project.

i.     False and Misleading Statements Regarding Green Card Petitions

21.     In furtherance of the fraud scheme, LI, WANG and their co-conspirators told EB-5 Investors in the TEC Project that their investment would guarantee their receipt of a green card within a specified period of time when in fact no such guarantee was possible.   Indeed, LI, WANG and their co-conspirators repeatedly and falsely told EB-5 investors that their investment in the TEC Project would guarantee the investors' receipt of a green card despite LI and WANG knowing that, as WANG stated in a July 2016 text message to LI and others, "US immigration law does not allow guarantee agreements...This is illegal."

22.     For example, in or around September 2015, WANG promised an EB-5 investor ("EB-5 Investor-1"), a PRC foreign national, that "[o]ur Green Card will 100% be obtained."   Shortly thereafter, in or about October 2015, EB-5 Investor-1 invested $500,000 in the TEC Project and filed his/her petition for a temporary green card with USCIS.   EB-5 Investor-1 never received his/her green card through his/her EB-5 investment in the TEC Project, and his/her temporary green card petition was denied by USCIS in April 2019.

23.     As another example, in or around June 2016, WANG guaranteed another EB-5 investor ("EB-5 Investor-2") that each of his/her four family members would receive green cards, stating "[t]he Green Cards and safety of the principal investment are guaranteed."   EB-5 Investor-2 invested $500,000 in the TEC Project and filed his/her petition for a temporary green card with USCIS in or around September 2016.   EB-5 Investor-2 never received his/her temporary green card through his/her EB-5 investment in the TEC Project, and his/her temporary green card petition was denied by USCIS in November 2017.

24.     As yet another example, in or around December 2016, WANG told another EB-5 investor ("EB-5 Investor-3"), a PRC foreign national, that "[o]urs is a college town project…. Our project will create 3 times the jobs needed. Will 100% obtain the Green Card and return of capital."   During this same text exchange, WANG also told EB-5 Investor-3 that he/she would receive her green card within 9 months.   EB-5 Investor-3 invested $500,000 in the TEC Project and filed his/her petition for a temporary green card with USCIS in or around May 2017.

25.     In approximately July 2018, after EB-5 Investor-3 had failed to obtain a temporary green card, EB-5 Investor-3 contacted LI via text message and requested the return of his/her EB-5 investment funds.   LI initially responded by claiming that she would have to consult with the TEC Project's Board about issuing the refund.

26.     Several months later, in approximately November 2018, after hearing nothing from LI about the requested refund, EB-5 Investor-3 again contacted LI and requested the return of his/her money.   EB-5 Investor-3 also informed LI that the FBI and the United States Attorney's Office were scheduled to interview EB-5 Investor-3 about the EB-5 investment in the near future.   This time, LI responded by offering EB-5 Investor-3 an immediate partial refund of $50,000, with the remainder of EB-5 Investor-3's investment to be refunded at an unspecified

future date.  When EB-5 Investor-3 declined this option, LI then agreed to refund the entire investment amount, which LI did a few days later.   Financial records reflect that LI and her co-conspirators refunded EB-5 Investor-3's $500,000 EB-5 investment using a subsequent EB-5 investor's investment in the TEC Project.   EB-5 Investor-3 did not receive a temporary green card through EB-5 Investor-3's investment in the TEC Project and withdrew his/her temporary green card petition in or around April 2019.

27.    LI, WANG and their co-conspirators persisted in making false representations about investors receiving green cards even after USCIS began rejecting EB-5 investors' temporary green card petitions.   Beginning on or about March 6, 2017, USCIS began issuing NOIDs denying the temporary green card petitions of the EB-5 investors in the TEC Project.   In the NOIDs, USCIS informed the EB-5 investors that it intended to deny their temporary green card petitions because USCIS did not believe that the TEC Project was viable.

28.    Among other reasons for denying the temporary green card petitions, USCIS expressed skepticism that TEC Project's plan to construct and operate an educational center that was projected to have two college classroom buildings, two college student activity centers, a sports center, a community center and six student housing buildings, including 132 units of townhouse style housing, 200 two-bedroom apartments and 50 three-bedroom apartments, was feasible in Sullivan County, which USCIS noted is a "rural county with no infrastructure available for high density projects such as [the TEC Project]" and that "[n]ot having a plan to address basic infrastructure needs of a project of this size in a rural county provides little to no credibility to both the business plan and the job creation estimates."

29.    Second, USCIS noted that although TEC had represented in its marketing materials to potential investors that "all required zoning approvals have initially been obtained in

order to develop the [TEC Project]," the information that TEC provided to USCIS did not support this assertion.    For example, USCIS noted that TEC had failed to provide USCIS with:

     a.    a site plan review by the Town of Thompson Planning Board for schools and colleges; USCIS noted that without a special use zoning permit, "the project cannot commence";

     b.    evidence of any pending environmental review;

     c.    a list of pending required construction permits; and

     d.    details or contract proposals on how TEC planned to address water and utility usage, and sewage removal and treatment.

30.    USCIS further noted that although TEC's business plan indicated that it expected to "work with prominent universities and educational foundations to provide joint programs," TEC had provided no evidence of these relationships or how TEC would work with these other entities.

31.    USCIS also noted that although TEC had indicated that it planned to raise $60 million from 120 EB-5 investors, only 21 petitions for temporary green cards had been filed as of March 2017.    USCIS indicated that it thus seemed unlikely that the project "will obtain the 120 investors needed to fully fund the project."    Similarly, USCIS noted that although TEC claimed that an additional $90 million from non-EB-5 funds was needed to complete the project, "no explanation or documentation was provided as confirmation or commitment of non-EB-5 funds."

32.    Despite USCIS's having issued NOIDs beginning in March 2017 because of USCIS's concerns with the viability of the TEC Project's business plan, and continuing to issue NOIDs to investors in the TEC Project between March 2017 and December 2017 for primarily the

same reasons that USCIS expressed in March 2017, LI, WANG and their conspirators continued

to solicit EB-5 investors by providing guarantees that they would receive a green card through

their investment in the TEC Project and that they would do so within a set period of time.

33.     For example, on or about March 20, 2017, WANG told a marketer for the

TEC Project located in the PRC who was soliciting potential EB-5 clients for the TEC Project that

ten EB-5 investors in the TEC Project had received approval for their green cards when, in fact,

no EB-5 investor in TEC had received an approval for a green card.   To the contrary, as of

approximately March 20, 2017, USCIS had issued NOIDs for the temporary green card petitions

of approximately ten EB-5 investors in the TEC Project.

34.     Shortly thereafter, on or about March 29, 2017, WANG promised a

potential EB-5 investor ("Potential EB-5 Investor-1") that he/she would receive a green card in

nine months.   By that date, the earliest EB-5 investors in the TEC Project had been waiting more

than two years and not one investor in the project had received a green card.

35.     Subsequently, on or about May 5, 2017, WANG told another potential EB-

5 investor ("Potential EB-5 Investor-2"), "[y]ou don't need to wait with our project, because we

started at end of June 2014.   The immigration bureau started auditing our cases last month. All

our clients are submitting supplemental documents.   Will get the Green Card in as little as 9

months."   WANG also told the potential investor that the investor "[w]ill 100% obtain the green

card."

36.     WANG continued to make these false and misleading statements to

potential investors throughout 2017 despite USCIS having sent multiple NOIDS to investors in

the TEC Project.   For instance, on or about August 20, 2017, WANG told another potential EB-

5 investor ("Potential EB-5 Investor-3"), "[a]ll I can say is will definitely 100% obtain the green

card and the principal investment will be 100% safe!"   Shortly thereafter, WANG sent the potential investor copies of green card approval notices for individuals who had invested in EB-5 projects unrelated to the TEC Project and wrote that "[t]hese are the approved clients who have already received their green cards."

37.     Additionally, and in furtherance of their scheme to defraud, LI, WANG and their co-conspirators also provided knowingly false statements to EB-5 investors regarding the status of their temporary green card petitions even after the petitions had been denied by USCIS.

38.     For example, in or about May 2016, an EB-5 investor ("EB-5 Investor-4"), a PRC foreign national, filed with USCIS his/her petition for a temporary green card through the TEC Project, investing $500,000 in the TEC Project.   On or about December 29, 2017, USCIS issued a final denial of EB-5 Investor-4's temporary green card petition.   Nevertheless, in 2018 and 2019, when EB-5 Investor-4's father, who had provided the $500,000 in funds for EB-5 Investor-4's investment, inquired about the status of EB-5 Investor-4's temporary green card petition, WANG repeatedly told EB-5 Investor-4's father that the TEC Project was going smoothly and indicated that WANG and LI were continuing to work on EB-5 Investor-4's green card petition.

39.     As another example, in or around 2016, another EB-5 investor ("EB-5 Investor-5"), a PRC foreign national, invested $500,000 in the TEC Project and filed his/her petition for a temporary green card with USCIS.   In or around March 2018, EB-5 Investor-5 learned that in December 2017, USCIS had denied his/her petition after visiting the USCIS website and checking on the status of his/her temporary green card petition.   Despite the issuance of the denial, on multiple occasions between approximately July 2018 through September 2019, LI told EB-5 Investor-5's mother, who had made the $500,000 EB-5 investment on EB-5 Investor-5's

behalf, that there was still a chance that EB-5 Investor-5's temporary green card petition would be approved.   For example, on or about September 12, 2019, EB-5 Investor-5's mother asked for a written agreement for a refund of her EB-5 investment, because EB-5 Investor-5 had not received a green card.   LI replied, "I will first refund, then provide the written agreement, because the Green Card will still be approved shortly."   In reality, when LI made this claim to EB-5 Investor-5's mother in September 2019, approval of EB-5 Investor-5's petition for a temporary green card was no longer possible because the December 2017 denial issued to EB-5 Investor-5 was not appealed within the required time period set by USCIS.   As of April 2022, LI had not refunded any of EB-5 Investor-5's $500,000 investment.

ii.   <u>False and Misleading Statements Regarding Construction Approvals and Construction Progress</u>

40.   As part of their scheme to defraud investors, on multiple occasions throughout the Relevant Period, LI, WANG and their co-conspirators falsely told investors that the TEC Project had obtained all the zoning and permitting approvals required to be obtained from the relevant local governments to construct the project despite knowing that these statements were false and misleading.

41.   In fact, on or about February 3, 2015, the Town of Thompson held a board meeting at which the board declined to extend sewer service for the proposed TEC Project site, without which the proposed project could not be constructed.   LI, WANG and their co-conspirators did not disclose the Town of Thompson's decision denying the extension of sewer service to existing or subsequent EB-5 investors; to the contrary, LI and her co-conspirators continued to solicit new EB-5 investors and to claim to current and potential investors that the TEC Project was on track for development.

42.     Subsequently, during an April 2017 Town of Thompson planning board meeting, the board informed LI that TEC did not have the required approvals to construct the project.    LI later received a copy of the board meeting minutes (the "April 2017 Thompson Board Minutes"), which reflected that the board had informed LI that TEC did not have the required approvals.

43.     Despite the Town of Thompson's clear statement that the TEC Project did not have the required approvals to begin construction, LI, WANG and their co-conspirators repeatedly assured investors and potential investors that the project had received all necessary approvals and was proceeding.    For example, in a series of August 2017 communications between LI and an EB-5 investor ("EB-5 Investor-6"), a PRC foreign national, the investor inquired about the status of the construction of the TEC Project.    LI responded that the TEC Project was going as planned, and that "the government has already approved the construction density. The environmental protection agency has approved two new permits.    In the latest communication, the immigration bureau should be giving our project the green light.    Everyone's approval should be issued soon."    At the time LI made these statements to EB-5 Investor-6, no construction density plan had been approved by the Town of Thompson, without which construction on the proposed TEC Project could not begin.    To date, the Town of Thompson has still not approved a construction density plan that will allow for the construction of the TEC Project.

44.     Moreover, beginning at least as early as October 2017, USCIS sent letters to both TEC Project EB-5 investors and their legal representatives (whom were retained by LI on the investors' behalves as part of their investment in the TEC Project) officially denying their petitions for temporary green cards.    These letters cited the April 2017 Thompson Board Minutes

as one of several bases for denying TEC investors' temporary green card petitions because the project did not in fact have the required construction approvals and was nowhere near obtaining them.   For example, in or around 2016, EB-5 Investor-5 invested $500,000 in the TEC Project and filed his/her petition for a temporary green card with USCIS.   In its December 29, 2017 letter issued to EB-5 Investor-5 denying his/her temporary green card petition, USCIS cited the April 2017 Thompson Board Minutes to refute LI's claim, contained in EB-5 Investor-5's response to USCIS's original NOID, that "there exists no pending issues or conditions to the issuance of the building permits for the renovation (other than the normal plan review process)."   USCIS, citing the April 2017 Thompson Board Minutes, stated that "the developer is restarting the project and that the project is currently in the planning stage," and that EB-5 Investor-5 had "failed to demonstrate that the necessary zoning approvals and construction permits to begin construction have been obtained or that it will be possible to obtain them in the near future."

45.     Between approximately October 2017 and August 2018, USCIS issued approximately 20 denial letters to EB-5 investors in the TEC Project; the letters contained language citing the TEC Project's failure to obtain the required permits and approvals as one of several reasons for the denial of each applicant's petitions for temporary green cards.

46.     Nevertheless, in or around August 2018, in response to an inquiry from EB-5 Investor-6 about the status of the TEC Project, LI falsely told EB-5 Investor-6 that "[a]ll the criteria for the construction permits are met. We are waiting for the documents. Once the documents are completed, the subsequent permits will be obtained."   A few months later, when EB-5 Investor-6 again asked for an update on the TEC Project and asked whether the permits LI previously mentioned had been obtained and construction had started, LI answered "Yes."   In

fact, no additional permits had been obtained for construction of the TEC Project and construction on the project had not begun.

47.    Similarly, in or around February 2019, EB-5 Investor-5's mother asked LI, "Is there any progress now? What is the status of the construction site?"    LI responded by sending pictures and videos of construction materials, including those seen here:



48.    The photographs LI provided to EB-5 Investor-5's mother were not photographs of the TEC Project construction.    Rather, the photographs show a construction site of LI's in Fallsburg, New York, where LI had received permission from local authorities to construct one single-family residence (the "Fallsburg Residence"), adjacent to the proposed TEC

Project site in Thompson, New York.   Neither LI nor TEC ever received approval from the town of Fallsburg to use the site of the Fallsburg Residence for any commercial purpose.

49.    After she sent the above-described photographs to EB-5 Investor-5's mother, LI stated, in sum and substance, "the construction site is operating normally, a lot of shipping containers just arrived. We are unloading them now, and after the snow melts installation can begin."   LI also stated, "Due to the government shutdown, work at the Immigration Agency has been delayed, and the documents we submitted have not been audited yet."   LI then followed up by sending to EB-5 Investor-5's mother additional photographs of the construction site of the Fallsburg Residence, as seen here:



50.     EB-5 Investor-5's mother also asked, "[w]ill the school be able to open in 2019?"   LI responded, "There will be 500 vocational students starting school."   Shortly thereafter, EB-5 Investor-5's mother asked, "[w]hen will the actual houses be completed?"   LI replied, "In September, October, the actual houses will be shipped to the project site for installation."

51.     LI's statements and the photographs she sent to EB-5 Investor-5's mother as described above were false and misleading.    For example, as of February 2019, LI had still not obtained any permits to build any structures for the TEC Project in Thompson, New York. Moreover, as of March 2022, no structure had been completed on either the Fallsburg Residence or the Thompson property, and the Fallsburg Residence still contained only an unfinished foundation.   Furthermore, as detailed above, as of December 2017, USCIS had already denied EB-5 Investor-5's temporary green card petition, and USCIS has no record of LI or anyone else ever appealing that denial, meaning that when LI was writing to EB-5 Investor-5's mother about the TEC Project's status in February 2019, EB-5 Investor-5's temporary green card petition had already been permanently denied for more than a year.

52.     LI also continued to make similar misrepresentations about the progress of the TEC Project to other EB-5 investors, including EB-5 Investor-6.   In or around January 2020, EB-5 Investor-6 inquired about the status of the TEC Project.   During this exchange, EB-5 Investor-6 asked, "[i]s the project construction progressing smoothly? At what stage is at now?" LI replied, "Its smooth, the houses can be handed over [to the owners] in September."   As detailed above, when LI made these claims to EB-5 Investor-6, no construction on the TEC Project in Thompson, New York had been approved or commenced.

53.     In or around February 2020, EB-5 Investor-6 again asked LI about the status of the TEC Project.   During their text exchange, EB-5 Investor-6 asked LI, "[i]s construction work continuing on the project? You previously said that you were waiting for the foundation to be repaired, is this resolved?"   LI replied, "Yes, it was resolved, right now the fences are being installed."   LI then sent pictures of fencing around the Fallsburg Residence, which, as detailed above, had received zoning permission from the Town of Fallsburg for the construction of only a single-family residence.

54.     During this same discussion, EB-5 Investor-6 asked LI, "Has construction of the dormitories and the school buildings begun?"   LI replied, "Yes."   In fact, at this time, no construction of any dormitories or school buildings had begun in the town of Thompson, New York, the proposed site of the TEC Project.   EB-5 Investor-6 then asked, "Have any photos been taken recently?"   LI responded by sending several photographs, showing the construction site of the Fallsburg Residence, where there was no approval for any TEC-related construction.

55.     Similarly, beginning in January 2021, an undercover law enforcement agent ("UC") posing as a potential investor in the TEC Project engaged in a series of text messages and in-person discussions with LI and WANG about the UC's potential investment in the project. During the UC's discussions with LI and WANG, the UC repeatedly asked whether the TEC Project had received all necessary permits to complete construction of the project.   In response to these queries, LI falsely told the UC that the TEC Project had received "all the permits."

   iii.   <u>False and Misleading Representations Regarding TEC IPO</u>

56.     In furtherance of their fraud scheme, beginning at least as early as June 2015, LI, WANG and their co-conspirators also marketed, offered for sale and sold shares of stock in various business entities created by LI that were purportedly meant to raise funds for the TEC

Project, including but not limited to shares in the "Thompson Education Group" ("TEG"), the primary corporate entity used by LI, WANG and their co-conspirators for potential shareholders to invest in the TEC Project.   As part of their scheme, LI, WANG and their co-conspirators made false and materially misleading claims about the TEC Project's purported IPO.

57.     For example, LI and WANG made multiple false claims to investors regarding the progress of the listing of shares of the TEC Project on the New York Stock Exchange. In or around December 2018, an investor in the TEC Project ("Stock Investor-1") asked WANG about the progress of the TEC Project.   WANG replied to Stock Investor-1 that the TEC Project was being audited "right now" by an international audit and accounting firm ("Audit Firm") in preparation for the IPO.   In fact, records provided by Audit Firm representatives show that the Audit Firm never conducted an audit of the TEC Project, nor was the firm ever engaged to conduct such an audit.

58.     Later, in or around April 2019, WANG told another investor in the TEC Project ("Stock Investor-2") that an international investment bank ("Investment Bank-1") desired to collaborate with the TEC Project to issue shares in the project valued at $250 to $300 million.

59.     Similarly, in or around January 2021, during the UC's discussions with LI and WANG about the UC potentially investing in the TEC Project, LI and WANG described to the UC several ways in which the UC could invest in the TEC Project, including as a stock investor. LI and WANG told the UC that they were working with Investment Bank-1 to form a Special Purpose Acquisition Company ("SPAC") to take the TEC Project public on the New York Stock Exchange.   WANG then sent pictures of LI and WANG meeting with employees of a private wealth management branch of Investment Bank-1.

60.     In fact, Investment Bank-1 never worked with LI, WANG, any of their co-conspirators, or any TEC entities to assist in taking the TEC Project public on any stock exchange, nor did Investment Bank-1 ever agree to raise any capital from its investors or anyone else for any investment related to the TEC Project.   Rather, in or about March 2019, LI opened two brokerage accounts at a private wealth management branch of Investment Bank-1 in New York, one in the name of "Thompson Education Group Trust LLC" and the other in the name of "Thompson Education Group."   Both accounts remained entirely unfunded until the accounts were closed in approximately August and October 2019 respectively.

61.     On or about August 13, 2019, LI, WANG and others met with employees of a separate private wealth management branch of Investment Bank-1 in Washington, D.C. During this meeting, LI pitched the prospect of an IPO for the TEC Project.   An employee of Investment Bank-1 told LI that the project was not suitable for an IPO and that the private wealth management group does not work on IPOs.   The employees further indicated that they would not introduce LI to members of Investment Bank-1s's banking group, which does handle IPOs.

62.     At the conclusion of the August 13, 2019 meeting, LI asked for a photograph of herself, WANG and other members of her group with Investment Bank-1 employees in front of Investment Bank-1's logo.   A redacted version of the photograph is included below, depicting LI and WANG, whose faces are not obscured, with Investment Bank-1 employees, whose faces are obscured:



63.     In or about January 2021, WANG invited the UC to the Oyster Bay Residence to discuss the UC's potential investment in the TEC Project and specifically, in sum and substance, how TEC "is working together" with Investment Bank-1.    Immediately thereafter, WANG texted to the UC photographs that LI and WANG took during their August 2019 meeting with employees of Investment Bank-1's Washington, D.C. private wealth management group, including the unredacted version of the photograph shown above.   At the time WANG sent the photographs to the UC, Investment Bank-1 was not working with LI, WANG, any of their co-conspirators, or any TEC entities on any investment related to the TEC Project.

iv.     <u>False and Misleading Statements Regarding TEC Partnerships with Other Schools</u>

64.     In furtherance of their scheme to defraud investors, LI and WANG also falsely represented to existing and potential investors that TEC had entered into agreements and contracts with various educational institutions under which these institutions would work with TEC, including by providing professors, staff, and curricula to TEC students.

65.    For example, on or about June 1, 2017, WANG used an electronic messaging application to re-send a message from LI to EB-5 Investor-3, as well as to other investors and co-conspirators.   The message stated, in sum and substance, "Had a meeting with the new president of the state university, and some exciting China-US collaborative education project proposals have been initiated. Will be pushing out over 30 in demand educational programs to the 20+ universities and 30+ high schools that we have already signed contracts with."   LI's message further stated, "The next step is to work with the school president to refine the equipment needs for the various majors."   Enclosed with the message were a number of photographs of LI meeting with the president of a New York state university based in Sullivan, New York ("University-1").   In fact, LI and the University-1 president met only briefly on two occasions in the summer of 2017.   These meetings did not result in any agreement or contract between any TEC Project entities and University-1 to provide services of any kind, nor was any project proposal ever initiated between University-1 and LI, WANG, any of their co-conspirators, or any TEC entities.

66.    Similarly, in or around January 2019, LI sent WANG a brochure advertising a joint Executive Education program purportedly sponsored by another university ("University-2") and TEC.[3]   LI described this brochure to WANG as the "[University-2] class."   WANG and LI then discussed edits to the brochure.   The brochure sent by LI to WANG prominently featured University-2's name and graphic shield, and also contained a curriculum and class schedule that would purportedly take place in January 2019 at University-2's graduate business school.   The brochure claimed that the joint University-2-TEC program would be taught by "experienced

---

[3] University 2's records show that in or around January 2019, LI downloaded multiple brochures from University 2's website similar in content and design to the one LI sent to WANG as described above.

teachers from the [University-2] Business School."   The contents of the brochure were false; University-2 never had any relationship with TEC, let alone a joint "Executive Education" program, nor did University-2 ever have plans to create such a program with any TEC entities. Subsequently, in or around March 2019 an investor in the TEC Project ("Stock Investor-3") inquired with WANG about the progress of the TEC Project.   WANG replied that TEC had started bringing in students, and also stated "Beginning [University-2] Education Class now."

67.     During a meeting with the UC in or around February 2021, LI told UC that TEC had an agreement with another university ("University-3"), under which TEC would pay University-3 $12 million a year to use University-3's brand and to have University-3's professors teach on the TEC campus.   LI also claimed that TEC students would receive diplomas issued by University-3, and that TEC would share with University-3 the tuition it received from its students. In fact, no such agreement between the TEC Project and University-3 ever existed.   In or around April 2021, after the UC asked LI for a copy of the purported agreement between TEC and University-3, LI falsely claimed that the agreement was still being edited.   LI never provided the purported agreement to the UC.

v.   <u>False And Misleading Claims Regarding Government Support For TEC Project</u>

68.   In furtherance of their scheme to defraud, LI, WANG and their co-conspirators also falsely claimed to investors that they had political support for the TEC Project that would assist investors in obtaining regulatory approvals for the project when, in fact, no such support existed.   To accomplish this, LI, WANG and their co-conspirators made hundreds of thousands of dollars in political contributions to various elected officials and political committees in order to, among other things, obtain photographs with candidates for elected office and elected officials, which the conspirators then showed to investors as purported proof of support for the TEC Project.

69.   For example, in or around December 2016, EB-5 Investor-1 inquired about the status of his/her temporary green card petition, noting that he/she had been promised that he/she would receive the temporary green card within nine to fourteen months of his/her submitting his/her temporary green card petition to USCIS.   WANG responded by assuring EB-5 Investor-1 that he/she would receive his/her green card "very soon" and telling EB-5 Investor-1, "[w]e are very close with the current president [of the USA]. Will get the Green Card 100%."

70.   Also in December 2016, a co-conspirator sent an email to EB-5 Investor-3 – copying LI and WANG – containing material to complete EB-5 Investor-3's investment in the TEC Project.   Included in the material was a TEC Project brochure which included a section titled "Government Support."   This section of the brochure contained numerous photographs of LI and WANG with various political figures, including the then-President-elect of the United States, the then-Vice President-elect of the United States and the then-Governor of the State of New York ("Governor").   Under several photographs of LI, WANG and the Governor, the caption stated, in sum and substance, that "the project has received the governor's strong support."

71.     During a February 2017 text message conversation with another EB-5 Investor ("EB-5 Investor-7"), WANG shared a new marketing brochure for the TEC Project.   The brochure included multiple photographs of LI with various senior government officials, including the then-President of the United States and Cabinet members.   A section of the brochure titled "government relations" also contained numerous photographs of LI and WANG with various current and former government officials, including a United States senator, Cabinet members, and high-level state and local government officials.   The brochure stated that "TEC has received the strong and powerful support of the government."

vi.   The Defendants' Scheme to Obstruct the FEC's Enforcement of the FECA

72.     As part of their effort to solicit investments by foreign nationals in the TEC Project, LI and WANG orchestrated a scheme to make "straw" donations of foreign money to U.S. politicians and political committees.   The defendants obstructed the enforcement of the FECA by causing those politicians and political committees to inaccurately report the true source of the political contributions they received to the FEC.   Specifically, and among other things, LI and WANG promised foreign nationals access to U.S. political events and politicians in exchange for money.   LI and WANG used the money they received from foreign nationals to fund political contributions purportedly by U.S. citizens in violation of the FECA, and falsely identified themselves and other U.S. citizens as the contributors of the funds.   In doing so, LI and WANG conspired to willfully violate FECA and obstruct the FEC's administration of FECA by concealing the true origin of the money contributed to U.S. candidates and political committees, and by causing and concealing violations of FECA's prohibition against foreign nationals making political contributions.   In some cases, LI and WANG used TEC investors' investment funds to make the

political contributions which they used to gain access to the political events, where LI and WANG took photographs with elected officials.

      a.  The Defendants' Knowledge of Applicable Law Regulating Campaign Contributions

73.    On multiple occasions, LI and WANG were informed of the laws and regulations governing the making and reporting of political contributions in connection with political contributions that they made in their own names with their own money.   For example, on or about January 13, 2016, WANG received a message on an electronic messaging application written in Mandarin Chinese from a congressional candidate ("Candidate-1") soliciting campaign contributions.   The message began with a link to a donation website, an address to mail donations made by personal check, and then clearly stated, "Donation Notice: According to federal law, donations are limited to US citizens and greencard holders, the maximum for each individual for primary elections and general election is $2700 each. [Thank you emoji] [Thank you emoji]." This message was immediately followed up by another message from Candidate-1, who stated, "Welcome to forward to friends who are willing to support [Thank you emoji] [Thank you emoji] [Thank you emoji]."   In response, WANG confirmed he had received this message by replying, "Received big sister."   On or about the next day, WANG forwarded the message from Candidate-1 soliciting campaign contributions to a co-conspirator, complete with the "Donation Notice" informing the recipient that under federal law donations were restricted to US citizens and green card holders.

74.    On or about January 19, 2016, WANG messaged Candidate-1, advising "Big sister, please let me know when you receive the check." Candidate-1 responded, "Thank you so much for opening your wallet. Very touched! When I receive it I will let you know for sure."

FEC records reflect that in January 2016 WANG donated approximately $1,350 to Candidate-1 under his own name.

75.    LI also received a similar warning from Candidate-1 of the federal law prohibition against political contributions by foreign nationals.    On or about September 26, 2016, Candidate-1 emailed LI, informing LI about a fundraiser being held in New York on or about September 29, 2016 for a candidate for the President of the United States ("Presidential Candidate") authorized by a national campaign committee ("National Committee").    Candidate-1 advised LI the entry fee for this fundraiser was approximately $35,000.    On or about September 28, 2016 Candidate-1 sent a message to LI using an electronic messaging application, stating "Special note: Person who donates must be US citizen or Green Card holder."    That very same day, LI emailed a National Committee employee ("National Committee Employee-1"), copying Candidate-1 on the email and requesting a reservation to attend the fundraiser for the Presidential Candidate.    FEC records reflect that on or about September 26, 2016, LI donated approximately $35,000 to a political committee affiliated with the Presidential Candidate under her own name.

b.    The June 2017 Political Event

76.    On multiple occasions after receiving these warnings, LI and WANG arranged to bring foreign nationals to attend political events and fundraisers in return for payments from these foreign nationals that were used by LI and WANG to fund political contributions that they falsely, and unlawfully, made in their own names.

77.    For example, on or about June 5, 2017, LI received an email from National Committee Employee-1 informing LI of the maximum annual contribution limits to the National Committee, and how much LI could still contribute in 2017.    Three days later, on or about June

8, 2017, the email exchange continued, with LI emailing another more senior National Committee

employee ("National Committee Employee-2"), writing:

> Tried to call you on your cell a few times.
>
> I talked with my Chinese guests. A number of them confirmed for the 28th Diner. I am working on to get their name and ask them to start to deposit. I will get together the name list and number of people to you.
>
> Some of others want to wait for next opportunity which is lower contribution.
>
> I told my guest this time will be high end, limited to 35 people. So it is higher contribution, but we get to spend good quality time with Mr. president.
>
> Please forward the invite for the 28th to me.
>
> Call me if you need to discuss.
>
> Thank you,
> Sherry

78. Less than an hour later, National Campaign Employee-2 responded to LI:

> Sherry – apologies I've been in budget meetings this afternoon. Please send over the names of your guests and the contributions they plan to make as soon as you can. Again, we can accommodate 2 guests per $100K, and all contributions must be received prior to the event. Invitation with contribution form attached.
>
> For clarification, on the phone I said 35 photos. There may be 50-60 people at the host committee reception since some photos will include couples, but this will still be an intimate event. We've agreed your group can go last so you have some additional time.
>
> I will await the details on your guests. Let me know if you have any other questions.
>
> Thank you for your efforts and support of the [National Committee]!

79.     Attached to National Committee Employee-2's email was a three-page PDF invitation to a June 28, 2017 fundraiser dinner to be attended by the President of the United States (the "June 28, 2017 Fundraiser") authorized by a joint fundraising committee (the "Joint Fundraising Committee") comprised of the National Committee and a committee supporting the re-election of the President of the United States ("Presidential Candidate Committee").   The invitation listed the cost of the dinner as $35,000 per person, with $100,000 for the "Host Committee."

80.     Subsequently, on or about June 13, 2017, National Committee Employee-2 continued to communicate with LI asking about the number of guests LI planned to bring to the fundraiser.   LI informed National Committee Employee-2: "Yes we have 9 confirmed.   And 3 more already told us they are coming.   We are working on to get their passport and deposit.   So all 12 spaces should be fully booked.   My assistant will e-mail you the passport of the 9 people who already confirmed."

81.     Later that same day, on or about June 13, 2017, LI's assistant emailed National Committee Employee-2, copying LI and stating, "The attachments are the passport who those already confirm.   We will continue to send you the rest of the passport."   Attached to this email were scanned photographs of the PRC-issued passports for seven individuals and a Singapore-issued passport for one individual.

82.     On or about June 20, 2017, LI's assistant sent a follow-up email to National Committee Employee-2.   The email listed "the final 12 guests for the dinner and their passport," and attached to the email were twelve files, each file a photograph of the photo page of the passport of each of the twelve listed individuals.   Eleven of the passports were issued by the PRC government and one of the passports was from Singapore.

83.     While LI discussed the list of guests she planned to bring to the June 28, 2017 Fundraiser with the event's organizers, LI and WANG were collecting payments from the foreign national guests to fund the political contributions that LI and WANG were required to make as the price of admission to the event.    On or about June 8, 2017, in a group chat containing LI, WANG, and multiple PRC nationals who were planning to attend the fundraiser, WANG stated, "For this trip everyone needs to pay on their own! Everyone will need $80,000 USD! Sherry will need to pay too! This is the pricing given by the White House."

84.     Later, on or about June 12, 2017, WANG sent to the group chat a file with a Mandarin Chinese filename that translates to English as "Chinese Entrepreneurs Travel to US Relevant Agreement.docx"    The document, written in Mandarin Chinese, reflects a draft agreement under which Thompson B. Management, LLC, one of the TEC Entities, would arrange for the individual signing the agreement to travel to the United States, meet with the President and attend a banquet.    Under the terms of the agreement, the individual would pay $80,000 and an additional $13,800 for food and travel expenses.    The agreement also provided instructions for the counterparty to wire payment to LI's PRC-based bank account at China CITC Bank held in the name of Beijing Thompson Investment Consulting Co., Ltd., which was another of the TEC Entities LI had used to receive EB-5 investment funds from PRC-based investors (the "CITC Thompson Account").

85.     That same day, WANG messaged the same chat group to make clear that the foreign nationals were required to fund LI's and WANG's political contributions:    "Hi everyone! President Sherry asked me to tell you all that the deadline for payment is this Wednesday! Because we must send the check out next Monday!...If the funds and contract is not settled, and [you] face any changes in regards to the US trip, we do not take responsibility!"

86.     According to text messages exchanged between LI and WANG, one of the individuals who had executed the "Chinese Entrepreneurs Travel to US Relevant Agreement.docx" agreement and provided his/her passport to LI was unable to attend the fundraiser because he/she did not pass the required background check.   In response, WANG tried to find someone else to attend the June 28, 2017 Fundraiser.   On or about June 19, 2017, WANG messaged an individual who was in the United Kingdom at the time ("Individual-1"): "Do you want to go to the presidential dinner during the 25th to 29th? Total of 12 people all done! But 2 of them may not pass the background check."   WANG then told Individual-1 that another PRC national ("PRC National-1"), whom WANG identified by name, "is thinking of asking you to go. Lots of business opportunities. We arrange the whole trip. USD 93,000. Its considered donation."

87.     Around this time, financial records reflect that bank accounts controlled by LI and the TEC Entities received large wire transfers that LI and WANG then used to fund the political contributions required for admission to the June 28, 2017 Fundraiser.   Financial records reflect that the CITC Thompson Account received two incoming wire transfers between approximately June 13 and June 15, 2017 totaling approximately $173,000.   Notations associated with the wire transfers in the financial records stated that the funds had been "received on behalf of Chinese Entrepreneurs for conference in the US."

88.     On or about June 20, 2017, LI wrote a check for $270,500 from a personal checking account held in LI's name at First American International Bank (the "FAIB LI Account") to the Joint Fundraising Committee.   FEC records reflect that, on or about June 26, 2017, the Joint Fundraising Committee received a $270,500 campaign contribution in LI's name.   Financial records reflect that this check was funded by multiple wires totaling hundreds of thousands of

dollars received from Hong Kong-based bank accounts from approximately June 6, 2017 through June 19, 2017.

89.     On or about June 19, 2017, LI transferred approximately $330,000 from a bank account held at FAIB in the name of "New York International Management, Inc." for which LI was the sole signatory (the "FAIB NYIM Account"), to a personal checking account held at FAIB by WANG for which WANG was the sole signatory (the "FAIB WANG Account").   The $330,000 transferred by LI to WANG was funded by the same wires from the Hong Kong-based bank accounts which funded LI's check to the Joint Fundraising Committee.   On or about June 20, 2017, WANG wrote a check for $329,500 from the FAIB WANG Account to the Joint Fundraising Committee.   FEC records reflect that, on or about June 26, 2017, the committee received a $329,500 contribution in WANG's name.

90.     Both LI and WANG attended the June 28, 2017 Fundraiser.   Twelve Chinese and Singaporean nationals who provided their passports to the National Committee also attended the June 28, 2017 Fundraiser, and at least seven of these foreign nationals stayed at the same Washington, D.C. hotel as LI and WANG.   The bill for their hotel stay was at least $31,395.90, and LI paid the hotel bill using EB-5 investor funds in the TEC Project, thus misappropriating investor funds for her own benefit and for the benefit of the foreign national guests who attended the June 28, 2017 Fundraiser.

91.     On multiple occasions after the June 28, 2017 Fundraiser, LI and her co-conspirators requested from National Committee Employee-2 photographs from the event showing LI, WANG and the PRC nationals with the President of the United States.   On or about July 19, 2017, in response to LI's requests for the photographs, National Committee Employee-2 emailed LI copies of photographs of the president, LI, WANG and the twelve foreign nationals who

attended the June 28, 2017 Fundraiser, including the photo shown here of LI with the President and First Lady of the United States:



92.     Three days after the June 28, 2017 Fundraiser, on or about July 1, 2017, LI messaged a chat group comprised of WANG and several of the individuals who attended the Fundraiser.   LI provided the group with a status update on plans for the TEC Project, and stated that multiple individuals who had attended the fundraiser had signed letters of intent or subscription agreements to become shareholders in the TEC Project.

93.     LI later made material misrepresentations about the progress of the TEC Project to this same chat group that she had made to other TEC investors.   For example, on or

about July 14, 2017, LI messaged the chat group, falsely stating that "The current planning density of the project has been approved by the government…the government hearing on April 12 has passed." As detailed above, the proposed project density was never approved by the Town of Thompson.

94. Later that same day, on or about July 14, 2017, LI also demonstrated her knowledge and understanding of federal election law and political donations to the same chat group. In another message to the group, LI stated:

> In regards to explaining some doubts/suspicions:…Doubt/suspicion 4. Sherry Li only donated US$50,000 before Trump was elected as the president: This is an extremely one-sided collection of public information on the Internet with a little superficial effort: 1) In my WeChat circle, everyone has seen that I have attended the cabinet dinner, you can ask people knowledgeable in these matters- whether or not those who have only donated $50,000 are eligible to attend. In the United States, there is a science to donations. There is a legal limit for donations in the name of an individual at a certain event or at a specific time. However, different limited liability companies or foundation donations can be used, and family and friends can also be mobilized to make donations. I'm talking about personal donations and total funds raised together. As the financial committee member, this is within my duties to raise funds, and I can mobilize many supporters.

95. Similarly, WANG demonstrated his continued knowledge about FECA's prohibition of political contributions by foreign nationals. For example, on or about July 27, 2017, one of the PRC nationals ("PRC National-2") whom LI and WANG had brought to the June 28, 2017 Fundraiser asked WANG how much it had cost for individuals to attend the fundraiser. WANG responded, "If one is a finance committee member, it was US $100,000." WANG then also stated, "Foreigners cannot make donations."

     c.  The October 2017 Events

96.    In and around October 2017, as part of their continued effort to solicit investments by foreign nationals in the TEC Project, LI, WANG, and others continued to violate campaign finance laws.   Among other things, LI, WANG, and others used straw donations in order to illegally contribute foreign-sourced funds to federal political campaigns and to provide foreign nationals access to U.S. government officials in exchange for payments from the foreign nationals.

97.    Specifically, records show that LI created and executed a contract with a PRC national with no legal status in the United States ("PRC National-3") pursuant to which PRC National-3 would pay LI in exchange for LI arranging for PRC National-3 and LI to attend two political campaign events in October 2017.   Under the agreement, LI would arrange for PRC National-3 to travel to the United States and attend an October 25, 2017 "presidential roundtable" event (the "October 25, 2017 Event") where PRC National-3 and PRC National-3's assistant would meet and take photographs with the President of the United States and other politicians and business people.   The agreement further provided that PRC National-3 would also attend an October 26, 2017 dinner hosted by a state campaign committee ("State Committee") and the National Committee (the "October 26, 2017 Event").   Under the agreement, PRC National-3 would pay $210,000 for "expenses," to attend the events, which did not include the cost of food or lodging in the United States.   The agreement also provided instructions for PRC National-3 to wire payment to the CITC Thompson Account, which LI had also used to receive EB-5 investments funds from PRC-based investors.

98.    On or about October 25, 2017, LI and PRC National-3 attended the October 25, 2017 Event, where both LI and PRC National-3 took photographs with the President.   LI used

approximately $27,000 of TEC Project EB-5 investor funds to hire a private jet to fly LI, PRC National-3, PRC National-3's assistant and LI's boyfriend, K.M., to attend the October 25, 2017 Event.

99.     Records show that on or about October 31, 2017, LI withdrew $115,400 in the form of two cashier's checks from LI's TD Bank account held in the name of New York International Management (the "TD NYIM Account"), which LI controlled.    One of the cashier's checks was written to the National Committee for $105,400.    The second cashier's check was written to the State Committee for $10,000.    Bank records show that $115,400 in cashier's checks drawn from LI's TD NYIM account were funded by international wire transfers from several Hong Kong companies to the TD NYIM account.    As discussed below, LI used these funds, which were to make straw donations to attend the October 25 and October 26, 2017 events.

100.     FEC records show that LI's brother, B.L., was credited with donating $105,400 to the National Committee on or about November 2, 2017.    FEC records further reflect no indication that LI, PRC National-3, PRC National-3's assistant or K.M. made any donation to the National Committee during this period, despite their attending the October 25, 2017 Event. Additionally, FEC and other records reflect that by the time of the October 25, 2017 Event, LI had nearly reached the annual maximum individual donation amount to the National Committee, and LI therefore could not have legally made the $100,000 donation required to attend the October 25, 2017 Event.

101.     On or about October 26, 2017, LI attended the State Committee roundtable discussion with the National Committee Chairwoman.    The event was open to current members of the State Committee who had made an annual contribution of $10,000 or more.    Records,

including photographs of the event, show that LI attended this event with PRC National-3, PRC National 1's assistant and K.M., as contracted in the agreement described above.

102.     On or about October 30, 2017, the State Committee received a $10,000 donation check from WANG.   The check was dated October 26, 2017 and was drawn on WANG's personal checking account at TD Bank (the "TD Wang Account").   The next day, on or about October 27, 2017, LI reimbursed WANG for his $10,000 donation with a check from her bank account at East West Bank held in the name of Thompson B. Management (the "EWB TBM Account"), which, as detailed below, was used by LI to receive and misappropriate TEC Project investor funds.   LI's $10,000 check to WANG was funded by incoming wires from several companies located in Hong Kong.   Records indicate that WANG did not attend the October 26, 2017 State Committee event, despite making the $10,000 donation which LI reimbursed.

103.     LI also used her brother, B.L., as a straw donor to the October 26, 2017 Event.   Specifically, financial records show that the foreign-source funded $10,000 cashier's check LI withdrew from her TD NYIM Account on October 31, 2017 was made out to the State Committee.   FEC records reflect that B.L. was identified as contributing $10,000 to the State Committee on or about November 8, 2017, which I believe to be the contribution that LI was required to make to attend the October 26, 2017 Event.   It appears that LI's brother B.L. did not attend the October 26, 2017 Event.   FEC records also indicate that no donation to the State Committee was recorded in the names of LI, PRC National-3, PRC National-3's assistant or K.M. during the time period around the October 26, 2017 Event.   Additionally, in email communications between LI and representatives of the State Committee for coordinating the October 26, 2017 Event, LI indicated that the $10,000 donation made in B.L.'s name, as well as WANG's straw donation, were used by LI to attend the October 26, 2017 Event with PRC

National-3 and PRC National-3's assistant.   Records show that in December 2017, after PRC National-3 and PRC National-3's assistant attended the October 2017 events, PRC National-3's assistant invested approximately $31,500 in the TEC Project.

> d.   Further Evidence of the Defendants' Willfull Effort to Obstruct the FEC's Enforcement of FECA to Secure Investment in the TEC Project

104.   WANG also demonstrated his knowledge of FECA's prohibitions against foreign-sourced donations on subsequent occasions when offering to provide foreign nationals access to U.S. political events for money.   For instance, on or about December 27, 2018, during a text and voice message exchange, WANG was asked by a PRC national ("PRC National-4") how much it would cost for a client to take a picture with the President of the United States, as WANG had arranged for the other wealthy PRC national businesspeople.   WANG responded to this question by sending two photos from an August 2018 political fundraising event, including a photo of the President with a PRC national businessman ("PRC National-5").   Notably, during this same exchange, WANG sent to PRC National-4 a copy of a TEC brochure titled "Thompson Education Center Government Relations" which contained multiple photographs of LI and others with U.S. politicians, including the photograph of LI and the President and First Lady of the United States taken at the June 28, 2017 Fundraiser and included in Paragraph 91 above.

105.   Later that day, WANG told PRC National-4:

> It's unlawful for businessmen in China to make donations. But these businessmen can invest in our company and become our shareholders. We can then arrange for them to meet with the president, congressmembers, etc. Donation is definitely necessary. Our company can do that and it is legal.

106.   When PRC National-4 then asked "What's the minimum investment to become your shareholders?"   WANG replied that if someone wanted to meet the President and Members of Congress, "it's ok if they don't become shareholders.   They must pay us at least US

$200,000.   They should pay US $220,000, $220,000 should be doable."   During this same exchange on the same date, WANG also described the TEC Project to PRC National-4, including TEC's purported plan to conduct an IPO on the New York Stock Exchange in the near future, and sent PRC National-4 a copy of a TEC Project subscription agreement to purchase shares in that same purported IPO.

107.   Similarly, on or about March 14, 2019, LI, WANG and another co-conspirator engaged in a group electronic messaging chat with several individuals.   During the exchange, WANG sent to the group several photographs of PRC National-5 and the President of the United States that were taken at an August 13, 2018 political fundraising event which LI attended.   After sending the photographs, WANG told the group, in sum and substance, that WANG and LI had arranged "everything" for PRC National-5's meeting with the President of the United States.   Approximately two weeks later, one of the individuals on the group chat thread invested more than $200,000 in the TEC Project.

108.   Furthermore, in or around January 2021, at a meeting between the UC, LI and WANG at LI's Oyster Bay Residence, the UC remarked about several photographs of LI and prominent U.S. politicians hanging on LI's walls, including a photograph of LI and a former President of the United States.   LI responded, in sum and substance, "certain licenses and permits have to be obtained from Washington, D.C., so it's necessary to rub shoulders with whoever is the current governing body."

109.   Similarly, during a subsequent meeting with the UC in or about February 2021, the UC asked LI, in sum and substance, what benefits came from knowing so many politicians.   LI responded, in sum and substance, that "certain special permits need to be obtained

from Washington, D.C.," and that "departments in Washington D.C. oversee this project and you have to have a good relationship with them…otherwise they can give you a hard time."

III.    The Defendants' Money Laundering To Conceal Defrauded Investors' Funds

110.    In furtherance of their fraud scheme, LI and WANG misappropriated and laundered at least $2 million of investors' funds during the Relevant Period.    In order to conceal and disguise the misappropriation of investor funds, LI created numerous companies that she controlled, and also opened numerous bank accounts in the names of those entities.    Using these companies and financial accounts, LI, WANG and their co-conspirators misappropriated and laundered investor funds, including LI's transfer of approximately $900,000 to the father of her child ("S.A."),[4] approximately $79,000 to her father ("Y.L."), approximately $35,000 to K.M., and hundreds of thousands of dollars spent by LI on personal expenses, including mortgage payments, property taxes, utility bills, credit card bills, apparel retailers, nannies and travel expenses.    Additionally, LI and WANG also funneled investor funds through various financial accounts which WANG in turn spent for his personal use.

111.    For example, in or around June 2015, LI opened the EWB TBM Account referenced above.    LI was the sole signatory on the EWB TBM Account, which was funded primarily with TEC Project investor funds.    Between approximately September 2015 through November 2018, LI issued checks from the EWB TBM Account totaling at least $948,000 to pay

---

[4] S.A. has a criminal conviction for securities fraud in the Southern District of New York. On or about April 26, 2001, S.A. was sentenced to 24 months' imprisonment.    In various marketing materials and messages provided to potential investors between at least 2013 and 2016, S.A. purportedly held various positions with CCOA and TEC, including "Secretary" of both CCOA and TEC and "Manager" of TEC.    During a January 2014 interview with the FBI, LI told agents, in sum and substance, that she was aware of S.A.'s fraud conviction, that S.A. "was never associated" with any of LI's businesses, and that he was mistakenly included in marketing materials.

for a variety of expenses, including approximately $468,000 that she paid to S.A., approximately $176,000 in political contributions to various local, state and federal political campaigns, approximately $61,000 in payments to Y.L., $27,000 for a private jet to bring PRC National-3 and PRC National-3's assistant to a political fundraiser as described above, $22,000 in payments to nannies for LI's son, $9,000 in purchases at various retailers, and $2,000 to pay traffic violation fines.

112.    In order to conceal and disguise her misappropriation of TEC investors' funds, LI also diverted investor funds from her EWB TBM Account by layering transactions through various other bank accounts she controlled and then using those funds to pay for personal expenses.   For example, in or about November 2014, LI created a company named CFS Asset Management, Inc. ("CFS Asset Management").   In or about December 2014, LI opened a bank account in CFS Asset Management's name at New York Community Bank (the "CFS Asset Management Account").   LI was the sole member of CFS Asset Management and the sole authorized signatory on the CFS Asset Management Account.   Approximately once a month, LI issued a check in the amount of $15,000 from the EWB TBM Account, which was funded primarily with the funds of TEC Project investors, to her CFS Asset Management Account.   In total, between approximately September 2015 through October 2018, LI issued checks totaling approximately $430,000 of TEC Project investor funds from the EWB TBM Account, and deposited the money into the CFS Asset Management Account.   LI used much of that money pay for a variety of her personal expenses.

113.    For example, LI used funds from the CFS Asset Management Account to make approximately $117,000 in mortgage payments for the Oyster Bay Residence, where she lived throughout the Relevant Period.   LI also paid at least $123,000 from the CFS Asset

Management Account to S.A., including approximately $52,000 in checks payable to cash with S.A.'s name in the memo line of the check and/or deposited by S.A., as well as approximately $17,000 to pay off a credit card held in S.A.'s name.   LI also used tens of thousands of dollars from the CFS Asset Management Account to repay a personal loan, and to directly fund numerous individual personal expenses, including payments for her son's extracurricular activities and purchases at various retailers.   LI also used the funds in the CFS Management Account to pay off multiple credit cards held in her and S.A.'s names, including to pay for personal charges made by S.A. at casinos, a jewelry store and other high-end retailers.

114.   As another example of LI's layering of financial transactions to conceal misappropriated EB-5 investor funds, in or around June 2015, LI created a company named Fortune Source International, Inc. ("Fortune Source").   In or around May 2016, LI opened a TD business bank account in the name of Fortune Source International for which she was the sole signatory (the "TD Fortune Source Account").   Fortune Source has no known business operations and the TD Fortune Source Account was used primarily to launder proceeds of LI's and her co-conspirators' TEC Project fraud.

115.   For example, between approximately May 2016 and July 2018, LI transferred via check and wire transfers approximately $137,000 of TEC Project investor funds from her EWB TBM Account into TD Fortune Source Account, much of which LI then spent on various personal expenses.   The personal expenses include approximately $22,000 in payments from LI to S.A. and thousands of dollars LI paid to retailers including pet stores, department stores and a toy store.   For example, in or around February 2017, LI used investor funds previously transferred from the EWB TBM Account into the TD Fortune Source Account to purchase an item of jewelry for $3,000.

48

116.     Additionally, in or around August 2010, LI created a company named "CPA Express Inc."   In or around March 2014, LI opened a Sterling business bank account in CPA Express's name for which she was the sole signatory (the "Sterling CPA Express Account"). Between approximately January 2015 and January 2018, LI transferred via check and wire transfer into the Sterling CPA Express Account approximately $316,000 of TEC investor funds from the EWB TBM Account and another bank account which she controlled and held in the name of Thompson B. Management, LLC at Capital One.   LI spent at least $115,000 of these EB-5 investor funds, withdrawing approximately $50,000 as cash, paying approximately $37,700 to S.A., paying approximately $15,000 to a Chase credit card held in the name of a TEC employee, paying approximately $5,000 in payments to an American Express card, and paying approximately $4,300 in mortgage payments on the Oyster Bay Residence.   The credit card payments LI made to Chase and American Express covered thousands of dollars of personal expenses including shopping at luxury retailers, travel to Alaska and Europe, dining, lodging at casinos, and additional payments of at least $1,300 to S.A.

117.     LI also diverted large sums of investor funds to K.M.   Specifically, between approximately September 2017 and July 2019, LI made payments totaling approximately $47,000 to K.M from various bank accounts LI controlled.   For example, in or around May 2015 LI, opened a TD Bank account under the name "Thompson Education Center LLC" for which LI and a TEC employee were the sole signatories (the "TD TEC Account").   The sole source of funding for the TD TEC Account was TEC Project investor funds.   Between approximately September 2017 and March 2018, LI transferred via check approximately $44,000 in investor funds from the TD TEC Account to K.M.

118.     LI and her co-conspirators also used various financial accounts to conceal and disguise their diversion of TEC Project investor funds to WANG.   For example, in or about April 2012, LI created a company named WXS International, LLC ("WXS International") and in or about November 2015, she opened a bank account held in WXS International's name at TD Bank (the "TD WXS Account").   LI was the sole member of WXS International, and LI and WANG were the sole authorized signatories on the TD WXS Account.

119.     Between approximately November 2015 and April 2019, LI transferred via check and wire transfers approximately $341,000 to the TD WXS Account – the majority of which were EB-5 investor funds.   WANG then used a majority of the funds transferred to the TD WXS Account for personal expenses.   For example, in or around November 2015, LI wrote a $30,000 check payable to WXS International from the EWB TBM Account, with "prepayment, material purchases, and estimated manufacturer order" listed in the check's memo line.   Of this $30,000, WANG withdrew $2,000 in cash and spent approximately $6,000 on travel to Singapore and $1,500 on gym membership fees.   There were no identifiable expenses matching the check's memo line indicating the funds were intended for "prepayment, material purchases, and estimated manufacturer order."

120.     Similarly, in or around September 2017, LI wrote a check for $20,000 payable to WXS International from the EWB TBM Account with "work expenses" listed in the memo line.   Of this $20,000, approximately $9,000 was paid towards a credit card held in WXS International's name at TD Bank (the "TD WXS Credit Card").   WANG is the sole signor and authorized user for the TD WXS Credit Card.   The approximately $9,000 of payments to WANG's TD WXS Credit Card covered multiple personal expenditures made by WANG, including a single $3,000 purchase at a high-end apparel retailer, approximately $1,400 at a

steakhouse and approximately $500 at an arcade restaurant.    WANG also spent at least $3,650 of the $20,000 transferred to the TD WXS Account for other personal expenditures, including $1,000 paid to his ex-wife, $650 for rent at his personal residence, and approximately $2,000 at a designer retailer.

121.    Furthermore, between January and April 2017, approximately $18,000 in additional credit card payments were made via multiple checks from the TD WXS Account controlled by LI and WANG to WANG's TD WXS Credit Card.    The primary source of the funding of the checks was EB-5 investor funds.    The memo line of each check from the TD WXS Account to fund WANG's TD WXS Credit Card stated either "reimbursement" or "client development."    However, the credit card payments covered WANG's purchases at luxury retailers, upscale hotels, and restaurants, including approximately $5,500 charged at a department store in January 2017, and approximately $4,800 charged at a mattress store in March 2017.

122.    LI, WANG, and their co-conspirators misappropriated investment funds provided by EB-5 investors in the TEC Project for their personal expenses despite falsely assuring these investors and USCIS that the investors' funds were being invested in TEC.    For example, in documents signed by LI and submitted to USCIS as part of EB-5 Investor-3's temporary green card petition, LI identified as EB-5 Investor-3's investment capital for the TEC EB-5 project $500,000 deposited into one of LI's business bank accounts on or about March 20, 2017.    On or around March 30, 2017, one of LI's employees and co-conspirators told EB-5 Investor-3, "right now all the investment funds have already been transferred into the regional center."

123.    To the contrary, LI and her co-conspirators misappropriated and spent at least $120,000 of EB-5 Investor-3's $500,000 investment on an array of personal expenses, including political contributions.    For example, LI used approximately $40,000 of EB-5 Investor-

3's investment to make political contributions to a congressional campaign, a congressional fundraising committee, and a New York State Senator.   LI also wired approximately $30,000 of EB-5 Investor-3's funds to her CFS Asset Management Account and then used the money for various personal expenses, including approximately $8,600 in mortgage payments, approximately $5,000 in payments to S.A., $2,900 at a jewelry store, approximately $1,300 to repay a personal loan held in LI's name, and approximately $300 for her son's summer camp.

124.   Similarly, as detailed above, EB-5 Investor-4 filed his/her petition for a temporary green card through the EB-5 program with USCIS in or about May 2016.   In documents signed by LI and submitted to USCIS as part of EB-5 Investor-4's temporary green card petition, LI identified $500,000 deposited into one of LI's business bank accounts on or about March 16, 2016 as EB-5 Investor-4's investment capital for the TEC EB-5 project.   Later, in or around March 2019, WANG told EB-5 Investor-4's father that all of his child's money had been invested in the TEC EB-5 project and that by law, the money had to be used for immigration, explaining that "Its illegal if we spent the money on ourselves."   In fact, of EB-5 Investor-4's $500,000 EB-5 investment, LI, WANG and their co-conspirators misappropriated and spent at least $76,000 for personal use unrelated to the EB-5 investment project.

125.   For example, between approximately March 2016 and May 2016, LI wired approximately $50,000 of EB-5 Investor-4's funds from the EWB TBM Account to her Sterling CPA Express Account, which she alone controlled.   LI then paid approximately $17,000 from her Sterling CPA Express Account to S.A. in checks payable to S.A. or to cash with S.A.'s name in the memo line.   LI also wired an additional $15,000 of EB-5 Investor-4's funds from her EWB Account to her CFS Management Account and then used the funds to pay for thousands of dollars of personal expenditures, including approximately $4,000 in mortgage payments on her personal

52

residence, approximately $3,900 paid to S.A., approximately $648 to repay a personal loan held in LI's name, and purchases at various high end retailers.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants SHERRY XUE LI and LIANBO WANG, also known as "Mike Wang," so that they may be dealt with according to law.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the affidavit and arrest warrants.    The defendants are currently at liberty.    I believe that sealing these documents is necessary to preserve the integrity of this ongoing criminal investigation.    Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and arrest warrants via the Internet.    Therefore, premature disclosure of this affidavit and related documents may seriously jeopardize the investigation, including by giving targets an opportunity to flee from prosecution, destroy or tamper with evidence, and change patterns of behavior.


Ronald Chang
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable telephonic and electronic means
pursuant to Federal Rule of Criminal Procedure 4.1, this
___ day of July, 2022

Ramon E. Reyes, Jr.    Digitally signed by Ramon E. Reyes, Jr.
Date: 2022.07.14 15:29:08 -04'00'

THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK