UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

UNITED STATES OF AMERICA,　　　　　　　　　　**DECLARATION**

　　　　　　　　　　　Plaintiff,　　　　　　　　22-cr-00484-GRB

　　　-against-

SHERRY XUE LI, et al.

　　　　　　　　　　　Defendant.

------------------------------------------------------------------------x

　　　Raymond J. Zuppa, Esq. an attorney duly admitted to practice before the United States District Court for the Eastern District of New York and the Courts of this State.

　　　Pursuant to *28 U.S.C. § 1746* I hereby declare under penalty of perjury that the foregoing is true and correct:

　　　1.　　I represent the Defendant Ms. Sherry Li in this matter.

## MOTION TO WITHDRAW AS COUNSEL

　　　2.　　Rule 1.4 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York governs the displacement of counsel who have appeared:

> An attorney who has appeared as attorney of record for a party may be relieved or displaced only by order of the Court and may not withdraw from a case without leave of the Court granted by order. Such an order may be granted only upon a showing by affidavit or otherwise of satisfactory reasons for withdrawal or displacement and the posture of the case, including its position, if any, on the calendar, and whether or not the attorney is asserting a retaining or charging lien. All applications to withdraw must be served upon the client and (unless excused by the Court) upon all other parties.

*E.D.N.Y. Local R. 1.4*.

　　　3.　　"Whether to grant or deny a motion to withdraw as counsel is within the sound discretion of the district court." *Finkel v. Fraterrelli Brothers, Inc.*, No. 05-CV-1551 (ADS) (AKT), 2006 WL 8439497, at *1 (E.D.N.Y. Dec. 4, 2006) (citing *Whiting v. Lacara*, 187 F.2d

317, 320 (2d Cir. 1999).) New York's Rules of Professional Conduct divide the bases for withdrawal into two broad categories, namely, mandatory (*see* NYRPC rule 1.16(b)) and permissive (*see* NYRPC rule 1.16(c)).

4. When a client makes it unreasonably difficult for an attorney to effectively carry out representation, sufficient grounds exist to justify permissive withdrawal under the rules. *See* <u>Tokarz v. LOT Polish Airlines</u>, No. 96-CV-3154 (FB)(JMA), 2005 WL 8161165, at *2 (E.D.N.Y. June 20, 2005) (citation omitted); *see also* <u>Guichard v. Toulon</u>, No. 19-CV-3443 (JS)(JMW), 2022 WL 2612351, at *2 (E.D.N.Y. June 1, 2022) (same): <u>Interpool, Inc. v. JJS Transportation & Distribution Co.</u>, No. 22-CV-01103 (JMA)(JMW), 2022 WL 17335670, at *5 (E.D.N.Y. Nov. 30, 2022) (same).

5. "The balancing act for any outgoing counsel involves a delicate walk of the tightrope of disclosing sufficient information to establish grounds for withdrawal on the one hand, while not disclosing privileged or client confidences on the other." <u>White v. Advanced Cardiovascular Diagnostics, PLLC</u>, No. 22-CV-2587 (AMD)(JMW), 2023 WL 2163777 (E.D.N.Y. Feb. 22, 2023); <u>Luxwear Ltd. v. Adaptiv Rsch. & Dev. Grp.</u>, No. 22-CV-5458 (AT)(BCM), 2023 WL 3011912, at *2 (S.D.N.Y. Mar. 30, 2023) (same).

6. Please see the decision in <u>Villatoro V. LTMRL LLC et al</u>., 23-CV-01477 (JMA)(JMW) (08/07/23) (Magistrate Judge Wicks). I plagiarized much of this well written decision in the above.

7. It is important to note:

"[a]ttorney-client relationships frequently end because of personality conflicts, misunderstandings or differences of opinion having nothing to do with any impropriety by either the client or the lawyer." *Klein v. Eubank,* 87 N.Y.2d at 463…

<u>Louima v. The City of New York</u>, *2004 WL 2359943, *60 (EDNY 2004)*

> Under the Code of Professional Responsibility, "a lawyer may withdraw from representing a client if ... [t]he client ... renders it unreasonably difficult for the lawyer to carry out employment effectively." Disciplinary Rule ("D.R.") § 2–110(c)(1)(d), N.Y. Comp.Codes R. & Regs. tit. 22 § 1200.15. *See also Casper v. Lew Lieberbaum & Co., Inc.,* 1999 WL 335334, at *4. Where there is a history of nonpayment by the client, *see Galvano v. Galvano,* 193 A.D.2d 779, 780, 598 N.Y.S.2d 268, 269 (2d Dep't 1993), or where the client makes representation "unreasonably difficult," *see Bankers Trust Co. v. Hogan,* 187 A.D.2d 305, 598 N.Y.S.2d 338, 339 (1st Dep't 1992), an order of withdrawal is appropriate. *See Mars Productions, Inc. v. U.S. Media Corp.,* 198 A.D.2d 175, 176, 603 N.Y.S.2d 487, 488 (1st Dep't 1993). Thus, an attorney may properly withdraw from representation if a client fails to communicate with the attorney, *see Furlow v. City of New York,* No. 90 CV 3956, 1993 WL 88260, at *2 (S.D.N.Y. Mar. 22, 1993), or there is "an irreconcilable conflict between [the] attorney and client." *Generale Bank, New York Branch v. Wassel,* No. 91 CV 1768, 1992 WL 42168, at *1 (S.D.N.Y. Feb. 24, 1992); *see also Casper v. Lew Leiberbaum & Co., Inc.,* 1999 WL 335334, at *5; *Hallmark Capital Corp. v. The Red Rose Collection, Inc.,* No. 96 CV 2839, 1997 WL 661146, at *3 (S.D.N.Y. Oct. 21, 1997); *Cosgrove v. Fed. Home Loan Bank of New York,* No. 90 CV 6455, 1995 WL 600565, at *2 (S.D.N.Y. Oct.12, 1995).

*Id*. at *61.

  8. The Second Department addressed a key issue in this case:

> Under these circumstances, we find that the Supreme Court's denial of the appellant's motion to withdraw was an improvident exercise of discretion. It is well settled that an attorney will be permitted to withdraw from employment where a client refuses to pay reasonable fees *(see, Eldridge Realty Corp. v Green*, 174 A.D.2d 564; *Holmes v YJA Realty Corp.*, 128 A.D.2d 482; Code of Professional Responsibility DR 2-110 [C] [1] [f] [ 22 NYCRR 1200.15 (c) (1) (vii)]). The plaintiff refused to pay the fees in accordance with the clear terms of the retainer agreement and had ceased payment on her account more than two years before the appellant sought to withdraw. The appellant should not be forced to continue "to finance the litigation or render gratuitous services" *(Holmes v YJA Realty Corp., supra*, at 483; *see, Solomon v Solomon*, 172 A.D.2d 1081). Moreover, the record showed that the plaintiff's "conduct render[ed] it unreasonably difficult for the [appellant] to carry out [its] employment effectively" (Code of Professional Responsibility DR 2-110 [C] [1] [d] [ 22 NYCRR 1200.15 (c) (1) (iv)]; *see, Bankers Trust Co. v Hogan*, 187 A.D.2d 305; *Zelkha v Ezati*, 140 A.D.2d 338).

*Galvano v. Galvano*, 193 A.D.2d 779, 780 (2nd Dep't. 1993)

  10. Moreover, the existence of acrimony between client and attorney by itself is enough to convince the Court that counsel is no longer in a position to best represent the client's best interests in this action. *Shea v. F.C. Financial Services, Inc.*, 1994 WL 649176 (SDNY 1994).

11. Slowly but surely acrimony has crept into this relationship.

12. Present herein are a plethora of reasons for withdrawal.

**Non-Payment of Retainer**

13. First, under the unique circumstances of this case I cannot devote the time and resources necessary to adequately represent this client in a constitutionally and ethically competent manner. I cannot do that without suffering economic cataclysm that threatens not only myself but my family. I best I could try her a good conviction.

14. This is far from a garden variety case even as white collar crime is concerned.

15. I am solo practitioner. The bulk of my income – which is relatively a small income at the twilight of my career – is earned through "of counsel work" for a firm. If I do not personally bill the hours I do not get paid. I earn no money off the labor of others.

16. My wife has spent the last decade plus caring for her mother who suffered from severe dementia. Her mother recently passed away but it has been difficult for a woman over 60 years of age who has not held a job in decades to find employment. As such I am the sole source of income in the family.

17. Meanwhile I have a son that attends private college which costs approximately $80,000.00 per year and a host of emergency home repairs such as the replacement of a large deck that was collapsing as well as shingles that were falling off the house which necessitated a complete asbestos shingle tear down and complete siding. Moreover I am trying to fund retirement which is looming.

18. As boring and trivial as the above facts are they are dire to me.

19. The client came to me as a referral from a trusted past client that I represented in a lengthy civil matter. This former trusted client walked me into an ambuscade.

20.     Before my first appearance in this matter on October 2, 2024, I visited the client on September 20, 2024, for approximately two hours at Brooklyn MDC. We discussed the case at length including my immediate concern of putting together a bond package that would get her home – at least home confinement with electronic monitoring; because Brookly MDC is truly wretched.

21.     We also discussed the terms of the Retainer Agreement which the client signed. The client represented that her assets were all frozen by the Government but that she would easily be able to cover the retainer through various means all of which are legal and ethical. I impressed upon the client that from what I had seen of the case it was imperative that I get paid because the case would involve round the clock work to prepare for any trial.

22.     Before appearing in Court I printed, read, and digested every filing in this case – they are all organized into folders.

23.     Prior to appearing in Court at the behest of the Defendant and family members with whom I met I entered into what was dubbed a "Supplemental Retainer" that provided $3,000 dollars to fund the defense for a couple of weeks at which point I was assured that full payment would be made.

24.     The Defendant and her family requested that I provide them with a written statement of what my pretrial duties and activities would entail – which I did. I was informed it would be needed to show creditors.

25.     Immediately after the Court appearance through the kindness of the U.S. Marshall Service I met with the client for approximately two hours. At the end she too signed the "Supplemental Retainer."

26. In the days that followed I discussed the case with prior counsel. This included the sending of a discovery link with what is proving to be access to hundreds of thousands of pages of documents. In addition prior counsel promptly sent various electronic data storage items via Priority Mail.

27. Counsel also provided a discovery index including notations that multiple items could not be accessed as – for example – "devices excluded because they are too big and require Cellebrite." Another requirement is an "FTK imager."

28. I would add that counsel that had these problems is not a ham and egger like the undersigned. Rather he is a young extremely intelligent attorney that comes from the premier criminal defense firm in the area – perhaps the country. I had read the various eccentric motions regarding discovery from other counsel. But when the above counsel denoted difficulties I became concerned.

29. I have done these cases before – we received flash drives and portable hard drives, etc. But not this type of complexity.

30. I would say this – if the discovery is not accessible it is as good as not provided with all of the ramifications therein.

31. I quickly informed the Defendant with whom I engaged in weekly or bi-weekly "legal calls" of an hour in length that as per our retainer I was requesting permission to potentially pay an expert in the field of electronic discovery to assist. The client graciously assented and said that the money would be forthcoming – but I had not even gotten paid yet.

32. I immediately schedule a teleconference with the prosecution team which was held on October 25, 2024. The entire team. The main discussion centered on discovery. I was informed that the Government had taken via search warrant some 80 TB of electronic data from the

Defendant. As this Court knows "TB" means terabytes. I am sure this court is also aware that one single terabyte is equal to: 1,000 gigabytes (GB), 1,000,000 megabytes (MB), and the contents of about one million books. Other publications state that terabyte can store 1,000 copies of the Encyclopedia Brittanica – I believe that is a rather large book, 200,000 photos, 250 hours of high definition (HD) video, and thousands of hours of music.

33. I recalled the immortal line from Jaws: "We're going to need a bigger boat." Less comically I grossly underestimated the amount of time it would take one single intelligent lawyer – and I will stop the self-deprecating humor – to process and act upon the discovery.

34. The Government informed me that they, in effect, threw up their hands and just returned some 20 terabytes. Further if there was Brady material in there it was my problem. I inquired as to where these items were located. They stated I would have to "make arrangements" to come get it. What that means I do not know but it is not turning it over. I suppose they could not give it to Ms. Li at MDC.

35. I believe there is merit in a motion to have the Government just return every bit of electronic media that they seized. It is the Defendant's property. And no mischief can be done with it. Further the Government has copied it. The Defendant should have access to what she states are years of business documents showing the legitimacy of her business affairs. This is in light of the fact that the gravamen of the Government's case relies on the accusation that the Defendant's business is but a façade. The Defendant should have access to these documents and other electronically stored records in their native accessible format.

36. In any event I requested some assistance from the Government. Just someone who was somewhat savvy with Cellebrite and FTK imagers etc. to walk me through. I even requested guidance as to what type of high memory lap top I could purchase with attendant software to speed

up the process. I do not want to inject this material into my office set up because I do not know what type viruses and malware may be contained therein and the sheer bulk would crash the system that holds my life work – one transfer after the other – over decades.

37. The Government was slightly vexed. They informed me that they had spent countless hours and large sums of money assisting prior counsels – there have been a number of them – and they were through. I can empathize to a degree – but why not just hand it over in a manner that would not require NASA to open it in the first place.

38. The Government gave the names of certain prior counsel who could assist me. I informed them that said counsel were probably busy with their own cases. At the close of the conversation I asked, "just give me a computer geek to set me up so that I can do this myself." My son is a "computer geek" who majors in computer science. I had hoped to utilize him over the holiday break.

39. I informed the client that I needed to purchase a laptop with extraordinary memory capabilities in order to process the discovery. The client told me that I could most certainly purchase that computer and, by the way, my retainer and money to reimburse expense was forthcoming.

40. I immediately dove into the hundreds of thousands of documents contained in the link that someone masterfully created. Day after day – including Saturday and Sunday – I spent hours; sometimes eight hours or more processing the discovery along the lines of my theory of the case. Printing important items out. Organizing it into folders. Taking notes. For weeks. And I marveled at what I found.

41. I found defenses that aligned with what the Defendant told me. This is at best a case full of gray area and barely discernible lines.

42. I also found that I had not even scratched the surface of the discovery.

43. I also found that I had neglected my work for the firm that I do off counsel work for – the work that pays my bills. As a result some of it had been reassigned. And I lost the precious paying hours. I had to shift away from the Defendant's case in order to earn a living.

44. Throughout the second half of this process I continually warned the Defendant that she needed to make an application for assigned counsel through the Criminal Justice Act ("CJA") because I had to make a living wage. She would have none of it. The Defendant continually informed me that the money would be shortly forthcoming. During our last conversation over two weeks ago I was adamant that she needed to request CJA counsel as that would provide highly competent counsel – I had joint defenses with CJA in the past – that could prepare the case for trial. CJA also provides certain resources like a private investigator which we require for reasons I cannot disclose. The Defendant told me not to schedule another call with her. She would contact me. Further that the money was forthcoming shortly.

44. I have not heard from the Defendant. As stated previously we would speak upwards of twice a week.

45. In the past I have had to eat a case – go to trial without payment. You grin and bear it. But not a case of this magnitude that really requires a year of intense preparation wherein I could do little else.

46. This would put me on the streets. I would be better off resigning my bar licensure and working as store greeter at Walmart or Costco then remaining on this case.

47. While I understand the Defendant's grave circumstances I am tired of the platitudes.

**Divergent Opinions as to Course**

49.     It appears during conversations that the Defendant is under the belief that a trial will not be necessary. She has expressed that emergent and developing circumstances will cause the Government to discontinue the prosecution which she feels is politically motivated. I explained that this amounted to what is known as an innocence proffer which I thought could actually be counterproductive and even dangerous. That would depend on any agreement that she might have to sign. The Defendant persisted in explaining why she felt the Government, in effect, would drop the case. I flatly stated that there was no way the Government was even remotely considering entering into a *Nolle Prosequi*.

50.     Perhaps the Government can chime in with silence – which would speak volumes.

**The shifting Bond**

51.     As expressed in Court I felt that it was outrageous that the Defendant has spent two plus years in MDC Brooklyn. I was the new sheriff and I was going to get her out. Over the numerous phone calls, meetings, meetings with the family members – different bond proposals were discussed. I called in a favor and had a lawyer that specializes in this lend his expertise. The differing permutations were researched but they shifted in every conversation with the Defendant. Then the conversations would diverge back into the theory that the Government would in effect "drop the charges."

52.     I wasted many hours in this fruitless endeavor which has been abandoned.

**Shifting Stance on Plea**

53.     Given the amount of time that the Defendant has been locked up at Brooklyn MDC I revived plea discussions that prior counsel negotiated into a firm offer. I discussed this with the client and the Government. I did research into the First Step Act and any effect that doing time at

Brookly MDC might have on sentencing. Once again I called in a favor – an esteemed counsel – who not only explained the First Step Act but sent me a handy First Step Act calculator. One just plugs in some basic information and out comes the total length of sentencing as well as the date of release to a halfway house. It even projects dates for home confinement.

54. The Defendant maintained her innocence but nevertheless had varying stances on the business decision. However nothing could be nailed down and in the end it appears no plea will be taken.

## EXTENSION OF TIME

55. The Defendant's motions are due to be filed on December 2, 2024. Under the circumstances even if counsel were paid handsomely – which would not even be the case if I were paid the retainer at all – I would not be prepared to submit the motions. The motions – including statute of limitations, bill of particulars, vague indictment/double jeopardy, *Brady*, *Giglio*, *Roviaro,* Suppression, etc. – would be dependent on reviewing 80 terabytes of documents. I cannot even find the Search Warrant Applications yet to explore suppression.

56. In addition a May 5, 2025 trial is just not doable under all of the above circumstances. The best that could be done is the trying of a good conviction which this Court does not want and dare I say the Government does not want because they do not want to do it all over again.

## CONCLUSION

57. I humbly request to be released as counsel as I am incompetent under these circumstances. Further I suggest the Court appoint CJA or the Federal Defenders who – as I understand it from the last counsel on this case – were once assigned to this case and were dynamite

lawyers skilled at electronic discovery. Young and energetic. I have no idea why they are no longer here.

58. I also request that the dates for motions and the trial be indefinitely postponed and reset when some semblance of order has returned to the case.

59. I have informed the Defendant of my plans weeks ago. I informed her brother who contacts her frequently a number of times over the past week. And I have a legal call scheduled for 12:30 PM on Wednesday November 27, 2024 – the first available time slot I could get. It is during this call that I will inform the client that I have filed this declaration.

60. I would have moved sooner but the client pleaded against it. Why I do not know.

61. I do know this: "no good deed goes unpunished."

This declaration was executed on the twenty-second day of November, 2024 in Hauppauge, New York.

> By: /s/ *Raymond Zuppa*
> Raymond Zuppa